[Cite as *In re F.S.*, 2021-Ohio-345.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| F.S., et al. | : | CASE NOS. CA2020-08-011<br>CA2020-08-012 |
| | : | |
| | : | <u>O P I N I O N</u><br>2/8/2021 |
| | : | |
| | : | |
| | : | |

APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. AND20180068, AND20180069, AND20180332, and AND20180333

Jess C. Weade, Fayette County Prosecuting Attorney, Sean M. Abbott, 110 East Court Street, 1st Floor, Washington Court House, Ohio 43160, for appellee

Steven H. Eckstein, 1208 Bramble Avenue, Washington Court House, Ohio 43160, for appellant, mother

Hapner Law Office, Kathryn Hapner, 127 North High Street, Hillsboro, Ohio 43160, for appellant, father

**HENDRICKSON, J.**

{¶1}   Appellants, the mother of F.S., S.K., B.K., and R.K. ("Mother") and the father of S.K., B.K., and R.K. ("Father"), appeal the decision of the Fayette County Court of Common Pleas, Juvenile Division, which granted permanent custody of the children to

appellee, Fayette County Children Services ("FCCS").  For the reasons discussed below, we affirm the juvenile court's decision.

## I.  Facts and Procedural History

## A)  Events Before the Permanent Custody Hearing

{¶2}    This case involves four children: F.S., born in November 2011; S.K., born in December 2016; B.K., born in June 2018; and R.K., born in June 2018.[1]  F.S.'s biological father is not a party to this appeal.

{¶3}    On February 1, 2018, FCCS filed a complaint alleging that F.S. and S.K. were dependent and neglected children.  In support of the complaint, FCCS alleged that the children's home was in a deplorable condition with insect and vermin infestations and other unsanitary factors that made the home unsafe.  In addition to the complaint, FCCS also moved the court for an emergency order to provide FCCS temporary custody.  The juvenile court granted the motion and awarded temporary custody of F.S. and S.K. to FCCS.  FCCS filed a case plan with the goal of reunification of the family.  As part of the case plan, appellants were required to seek suitable housing for the children, attend parenting classes, and complete a mental health assessment.  Because Mother was pregnant, the case plan also required that she attend her medical appointments and follow her doctor's orders regarding the pregnancy.

{¶4}    On March 21, 2018, the juvenile court held an adjudicatory hearing. Appellants admitted that the children were dependent.[2]  The juvenile court continued the temporary custody order pending a dispositional hearing.  Appellants stipulated that FCCS had made reasonable efforts to prevent the continued removal of the children from their

---

1.  B.K. and R.K. are twins who were born during the pendency of the dependency proceedings.

2.  FCCS dismissed the neglect allegations.

home. The juvenile court journalized the dependency adjudication on March 27, 2018.

{¶5} The juvenile court held a dispositional hearing on April 17, 2018 and journalized the disposition entry on April 25, 2018. Appellants again stipulated that FCCS had made reasonable efforts to eliminate the need for continued removal of the children from the home. The juvenile court found that there was no other suitable person available for alternative placement and that it was not in the best interest of the children to be returned to the parents at that time. The juvenile court also adopted the case plan.

{¶6} B.K. and R.K. were born in mid-June 2018. On June 26, 2018, FCCS filed a complaint alleging the twins were dependent and neglected and moved, ex parte, for an emergency, temporary custody order for the newborns. The juvenile court granted the motion. On August 28, 2018, the juvenile court held an adjudicatory hearing. Appellants admitted to the facts in the complaint and the juvenile court adjudicated B.K. and R.K. dependent children.[3] The juvenile court further found that appellants waived a separate disposition hearing and stipulated that it was in the best interests of R.K. and B.K to remain in the temporary custody of FCCS. The juvenile court also found that FCCS made reasonable efforts to prevent the continued removal of the newborn children. The juvenile court adopted the case plan as amended to include the newborn children. The juvenile court journalized the adjudicatory and dispositional entries on September 5, 2018.

{¶7} In August 2018, FCCS authorized appellants to have an extended home visit with F.S. and S.K. However, various problems arose from this placement. F.S. began exhibiting behavioral problems and improper hygiene. There were concerns that S.K.'s motor skill were regressing, and she had contracted headlice. As a result of these concerns, the extended visit was terminated and, in October 2018, the children were returned to foster

---

3. FCCS dismissed the neglect allegation.

care.

{¶8} The juvenile court held several review hearings to monitor appellants' progress with the case plan. From these review hearings, the juvenile court found that appellants were completing the education recommendations in the case plan and addressing the issues that led their children's removal. However, FCCS expressed concern that appellants had difficulty retaining and utilizing the information learned from their parenting classes. After each review hearing, the juvenile court found that FCCS had made reasonable efforts to eliminate the continued removal of all the children.

{¶9} On August 20, 2019, FCCS moved for permanent custody of the four children. The juvenile court appointed a guardian ad litem for the children in September 2019.

**B) The Permanent Custody Hearing**

{¶10} The matter was initially set for a hearing in December 2019, however, FCCS moved to continue the matter.[4] The juvenile court granted that motion and held an initial hearing on February 7, 2020. The matter was continued in progress. Father moved to postpone the subsequent hearing date due to the COVID-19 pandemic. The juvenile court denied that motion. In addition, appellants moved, pursuant to R.C. 2151.281, for the appointment of a guardian ad litem on their behalf.

{¶11} The permanent custody hearing was continued to April 30 and May 1, 2020. On April 30, the juvenile court denied appellants' motion to appoint them a guardian ad litem. Over the course of the three-day permanent custody hearing, the agency called four witnesses to testify: a psychologist who performed a psychological evaluation of appellants, two caseworkers who were involved in the case, and the foster Mother of the three younger

---

4. FCCS initially moved to continue the permanent custody hearing to give itself more time to investigate.

children. [5]

{¶12} Dr. Judith Skillings, the psychologist, testified that she was asked by the agency to conduct an evaluation of appellants' cognitive abilities. For the evaluation, Skillings administered three tests: the Wechsler Adult Intelligence Scale ("Wechsler"), the Millon Clinical Multiaxial Inventory ("Millon"), and a "parenting questionnaire." The Wechsler test measures a test subject's comprehension ability to derive an "IQ" score. There are several subtests that comprise this test. Each subtest measures different indices, such as verbal comprehension, perceptual reasoning, working memory, and processing speed. These subtests are rated together to derive a composite IQ score. An average person would score in the 90-100 range, a low average score range is 80-90, a score of 70-80 indicates borderline impaired, and a score below 70 indicates intellectual disability. The psychologist determined that Mother's composite score was 69 and Father's composite score was 66. Therefore, the psychologist diagnosed both appellants with an intellectual disability of mild severity. The psychologist opined that appellants had a cognitive age of about ten years old. The psychologist testified that she was concerned that Mother's cognitive ability only allowed her the ability to focus on one or two things at a time. If there were more issues involved, it would present a situation too complex for Mother to process. Regarding Father, the psychologist noted that he had an "exceptionally weak" working memory. The psychologist then opined that these disabilities would negatively impact appellants' parenting ability.

{¶13} Next the psychologist discussed the Millon test. She encountered difficulty administering the test, because appellants could not adequately read the true/false

---

5. We note that there are different spellings of the witnesses' names in the record. The spellings used in this opinion are taken directly from the transcript of the proceeding.

questions to take the test. Instead, the psychologist read the questions to appellants. The test results correlated with her findings about appellants' cognitive age. Mother's personality is more reactive because she cannot understand the context of a situation. On the other hand, Father demonstrated a coping mechanism of "I've got this."

{¶14} Finally, the psychologist testified about the parenting questionnaire. Normally the test involves a set of 41 questions. However, the psychologist elected to terminate the test after only ten questions upon finding appellants' answers to be inadequate. This testing indicated that Mother would focus on one issue to the exclusion of others. By "centrating" the issues, Mother would resolve one facet of the problem and ultimately ignore the others. The psychologist found that Father had a similar tendency to limit the scope of the question. The psychologist admitted that she could not determine one way or another if in-home services would help appellants adequately parent. Ultimately, the psychologist opined that based on the information FCCS provided and the evaluation she conducted, appellants could not "master" parenting skills even with support.

{¶15} FCCS then called Ashely Ward, an agency case worker who worked with appellants from April 2018 to January 2019. She testified that she was involved in F.S.'s and S.K.'s removal and observed the deplorable home conditions. She explained that the case plan required appellants to have no contact with Father's brother because he was a registered sex offender. The plan included pregnancy and parenting classes. Finally, appellants would have to clean their home. She testified that during her time with the case, appellants completed the parenting classes and attended programs through "Help Me Grow" and "Early Head Start." In addition, the condition of the home improved such that the home was now "fine." She explained that FCCS had been involved in appellants' lives since they were children and there were no family members suitable for alternative

placement. FCCS's involvement increased in 2013, 2016, and 2017 when the agency intervened on behalf of the children and performed alternative responses. Ward also discussed why the older children were taken out of the home after appellants had been granted an extended in-home visitation in 2018. F.S.'s school repeatedly called the agency to raise different concerns about the child's behavior and hygiene. Also, it appeared that S.K.'s motor skills were regressing despite having gone through corrective therapy. When S.K. was removed, FCCS also discovered that she had headlice. Overall, the agency had an issue with appellants' ability to demonstrate or implement the parenting techniques taught in the various programs. There was also the issue of whether appellants could adapt to their children's needs.

{¶16} The third witness for FCCS was Taryn Fraley, the agency caseworker at the time of the hearing. She testified that she had been involved in the case since December 2019. She acknowledged that appellants completed the case plan. She discussed her impression of several parent-child visits she observed. It seemed to her on these visits that appellants had bizarre problem-solving techniques and the visits were chaotic. She believed that appellants could not properly parent without support or aid of services.

{¶17} The last witness called by FCCS was Bethany Heath, the foster mother to the three younger children. She testified about the children's developing life skills, for example, S.K.'s toilet training and the twins' language development. The foster Mother explained that the twins each have a third kidney which requires annual check-ups by a doctor. She testified that she intended to seek adoption of the children should they become available for adoption.

{¶18} Appellants, together, called 13 witnesses to testify. Appellants witnesses included the agency administrator for FCCS who supervised appellants' caseworkers, one

of appellants' former case workers, a parent-monitor from the Fayette County school system, two visitation monitors from the visitation center, the children's guardian ad litem, and several people from the various support services appellants used – Early Head Start, LIFE Pregnancy Center, and Scioto Paint Valley Mental Health center – during the pendency of the case.

{¶19}   Appellants' first witness was Beth Potts, the Fayette County Children Services administrator who supervised the agency caseworkers.  She testified that it appeared from the beginning that appellants had some kind of intellectual disability.  At a meeting with one of appellants' attorneys, Potts suggested contacting the National Youth Advocacy Program for in-home services.  Otherwise, Potts directed the case workers to locate and contact any other potential services.  The agency could not find any additional services for appellants.

{¶20}   The second witness for appellants was Tracey Perry.  She was the agency's caseworker for appellants from April 2019 to December 2019.  She testified that appellants' home condition had improved when she took the case, appellants had completed case plan services in her time, and appellants acted appropriately during their visits with the children.  She increased appellants' visitation with the children following a request by one of appellants' attorneys.  She explained that there were no in-home services available in the county because out-of-county providers would not cross county lines or there were payment issues.  Regarding the agency's decision to seek permanent custody, Perry acknowledged that appellants followed the agency's recommendations, however it appeared there was a constant and continuing need for support services to aid appellants in parenting.   She conceded that based on the statutory timetable for the case it appeared that permanent custody was the only option left.

{¶21}   The third witness called by appellants was Pam Thornburg, an Ohio parent

mentor for Fayette County schools.  She previously worked at the visitation center and had observed appellants interact with their children during their visits.  Thornburg did not note any concerns arising during the visits.  However, because she had only observed the short visits between appellants and the children, she was unwilling to comment on whether appellants could successfully parent independently.  She testified that some services could be provided through the school system, but Thornburg did not know which services would be available because she did not know if appellants had applied or would qualify.

{¶22}  The fourth witness called by appellants was Shawn Lachat, the executive director for LIFE Pregnancy Center.  The center provides material support, parenting education, and emotional/spiritual support to parents but is generally geared to parents of children under the age of three.  Lachat testified that she had known Mother since 2011 through Mother's enrollment in the center's various programs.  Mother completed two separate parenting programs in 2018.  Together these programs lasted a total of 24 weeks.  In addition, Mother completed around 62 other, voluntary consultations through the center.  Lachat believed that appellants did successfully learn and retain the information from the programs but acknowledged that some support system was necessary for appellants to be able to independently parent.

{¶23}  Appellants' fifth witness was Meghan Dimario, a teacher from Head Start.  She met appellants when she worked with them from February 2018 to July 2019, providing in-home services.  Dimario testified that she believed Mother successfully implemented her training although she was only able to observe Mother within the confines of the visitation center parent-child interaction.  Dimario acknowledged that Head Start was a voluntary day program and the teacher would not be on call after business hours.  While she did not think appellants needed assistance, she had never observed them independently parent.

{¶24} The sixth and seventh witnesses were Carmilla Bennett and Lori McClarren, both of whom worked at the visitation center as visitation monitors. Both witnesses testified that they supervised the visits between appellants and their children since August 2019. They had no issues with the visits, although that was the extent of their observation of appellants with the children

{¶25} The next five witnesses all worked in different capacities at the Scioto Paint Valley Mental Health Center. The first of these witnesses was Lisa Wolf, Mother's psychiatric nurse practitioner. She testified that Mother was diagnosed with depression and was taking medication for it. She explained that Mother learned from her counseling sessions and was a cooperative patient. She did not observe Mother parent any of the children.

{¶26} The next witness was Luann Beedy, a case manager at the center who taught Mother in some treatment groups. She testified that she taught Mother life skills. In the group, Mother was engaged and supportive. Beedy had seen Mother for at least four months prior to the clinic shutting down due to the COVID-19 pandemic. She did not observe Mother interact with the children.

{¶27} The following witness was Julie Ream, a substance abuse/mental health specialist. She treated Mother with cognitive behavioral therapy at least once a week since March 2019 and also saw Mother around three times a week through other therapy groups in which Mother participates. Ream stated that she has no issues with Mother's ability to learn, although she takes extra measures to help Mother understand the lesson. She was involved with both appellants in an "active parenting" class that lasted around 15 weeks. Appellants completed the class in 2019. She had not observed appellants with the children.

{¶28} The next witness called by appellants was Mary Jo Legg, Mother's case

manager at the center and a community psychiatric support treatment worker. She has worked with Mother since September 2019 to instruct Mother on life skills such as managing bills and parenting. Initially she provided in-home services but that tapered off because she did not have any concerns with the home and otherwise appellants did not have children living in the home. However, she explained that she would be available for in-home services in the future if the children were there. She would not commit one way or another on whether Mother was mentally incompetent because she did not have the licensure but explained that Mother is able to do things for herself such as cook, clean, and pay bills. She did not believe Mother's disabilities were severe enough to prevent Mother from parenting, although she acknowledged that Mother would need help.

{¶29} The last of the witnesses from Scioto Paint Valley Mental Health was Cameron Quigley, Father's mental health case manager at the center. He testified that he has been assigned to Father since November 2019. Like Legg, he provided in-home services and had met Father at least once a week. He testified that he saw no concerns with the home and believed Father learned and retained the parenting and life skills being taught. He conceded that Father needed a mentor for parenting. He hoped that the services could be tapered off eventually, though he could not predict when that would be. Quigley also testified that the center does not currently have a parent-mentor program but both he and Legg had suggested developing one at the center. Quigley also explained that prior to working at the center he was a caseworker for Fayette County Children Services and had been involved in the agency's prior alternative response with appellants in 2016 and 2017. The issues back then were similar to the issue that led to the instant removal in 2018, that is, the unsanitary condition of the home.

{¶30} The final witness called by appellants was the guardian ad litem for the

children.  She testified that she reviewed the court documents, visitation center records, agency file, and conducted some interviews.  The guardian ad litem testified that she did not ask the three younger children about their desire to be returned to appellants because they were too young.  F.S. liked visiting with appellants.  The guardian observed appellants interact with the children during a single two-hour visit.  She opined that it was in the children's best interest for the agency to have permanent custody.  She was primarily concerned with appellants' ability to respond to a crisis, especially one that could occur at odd hours when it would be less likely to receive outside help.  She also discussed her concern about appellants' parenting style from her observation of the visit.  Specifically, she noted that appellants did not seem to notice certain problem behaviors such as S.K. leaving the room or one of the infants banging his head on the ground during a temper tantrum.  The guardian ad litem also discussed how it appeared that appellants were coached on what to say during her interview with them because they immediately directed her attention to first-aid kits they had in the home and explained to her how they would react to different situations when the guardian had not inquired about those issues.

{¶31}  On August 6, 2020, the juvenile court granted FCCS's motion for permanent custody.  The juvenile court found that the children had been in the temporary custody of FCCS for 12 out of 22 consecutive months and that it was in the children's best interest for FCCS to have permanent custody.  Additionally, the juvenile court journalized its denial of appellants' motion to appoint a guardian ad litem on their behalf.  The juvenile court found that appellants' motion was untimely.  Otherwise, the juvenile court determined that appellants failed to show that they appeared to be mentally incompetent.

**II.  Appeal**

{¶32}  Mother and Father appealed.  They collectively raise eight assignments of

error for review. For ease of analysis, we will discuss similarly assigned errors together and discuss the assignments out of order.

## A) Constitutional Challenge to R.C. 2151.281

{¶33} Mother's Assignment of Error No. 2:

{¶34} THE R.C. 2151.281(C) IS VOID FOR VAGUENESS

{¶35} In her second assignment of error, Mother challenges the constitutionality of R.C. 2151.281(C). R.C. 2151.281(C) requires a court to appoint a guardian ad litem to protect the interest of a parent where that parent "appears to be mentally incompetent." Mother argues that neither this section nor R.C. Chapter 2151 define "mentally incompetent" and that by failing to articulate a specific definition, courts are left to guess the meaning to be applied. Consequently, the statute fails to provide a sufficient standard to prevent arbitrary enforcement and is void for vagueness.

{¶36} Mother concedes that she did not contest the constitutionality of R.C. 2151.281(C) before the juvenile court.[6] "Generally, an appellate court will not consider any error that counsel could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Peagler*, 76 Ohio St.3d 496, 499 (1996); *accord State v. Awan*, 22 Ohio St.3d 120, 122 (1986) (the question of the constitutionality of a statute must generally be raised at the first opportunity at the trial level). We decline to address this assigned error on the basis that Mother did not raise the constitutionality of the statute before the juvenile court.[7] Therefore we overrule

---

6. In the motion before the juvenile court, appellants cited R.C. 2151.281(B), instead of R.C. 2151.281(C). R.C. 2151.281(B) does not provide for the appointment of a guardian ad litem to a parent, therefore it was incorrectly cited.

7. We further question why Mother challenges the constitutionality of a statute that she sought to invoke for her benefit. If this court were to hold that the provision is void for vagueness, it would render the provision unenforceable and Mother could not rely upon the statute as a basis for appointment of a guardian ad litem.

Mother's constitutional challenge to R.C. 2151.281(C).

**B) The Juvenile Court's Decision to Deny Appointment of a Guardian ad Litem**

{¶37} Mother's Assignment of Error No. 1:

{¶38} THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION BY NOT APPOINTING A G.A.L. FOR MOTHER-APPELLANT.

{¶39} Father's Assignment of Error No. 1:

{¶40} THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO APPOINT A GUARDIAN AD LITEM TO REPRESENT FATHER-APPELLANT'S INTERESTS AS REQUIRED BY ORC 2151.281 AND JUVENILE RULE 4.

{¶41} In their respective first assignments of error, appellants argue that the juvenile court abused its discretion when it denied their motions to appoint a guardian ad litem on their behalf in accordance with R.C. 2151.281(C) and Juv.R. 4.

{¶42} Both R.C. 2151.281(C) and Juv.R. 4(B)(3) mandate that the court appoint a guardian ad litem to protect the interests of a parent who appears mentally incompetent. *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232 (1985). It is within the discretion of the juvenile court to determine whether the parent meets the requirements to have a guardian ad litem appointed. *See In re K.R.,* 11th Dist. Trumbull No. 2015-T-0008, 2015-Ohio-2819, ¶ 27. We review the decision to deny appointment of a guardian ad litem for an abuse of discretion. *Id.* An abuse of discretion is more than an error of law or judgment, it implies that the attitude of the court is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶43} In deciding whether to appoint a guardian ad litem, the inquiry is whether the parent appears to be mentally incompetent. *In re H.M.B.*, 7th Dist. Belmont No. 16 BE 0004, 2016-Ohio-5702, ¶ 68. Other appellate districts have added a prejudice prong to the

- 14 -

overall inquiry. However, that prong was generally included when the parents failed to raise the issue at the trial level and the appellate courts considered the issue under a plain error standard of review. *See e.g.*, *In re Amber G. & Josie G.*, 6th Dist. Lucas No. L-04-1091, 2004-Ohio-5665, ¶ 6; *In re King-Bolen*, 9th Dist. Medina Nos. 3196-M, 3231-M, 3200-M, and 3201-M, 2001 Ohio App. LEXIS 4551, *28 (Oct. 10, 2001); *In re T.R.-B.*, 8th Dist. Cuyahoga No. 106071, 2018-Ohio-3044. Here, appellants raised the issue before the juvenile court, so it is not subject to a plain error review. At any rate, a parent will not suffer prejudice if the parent is represented by counsel and that counsel "safeguards the parent's rights and advocates for reunification in accordance with the parent's wishes." *In re M.T.*, 6th Dist. Lucas No. L-09-1197, 2009-Ohio-6674, ¶ 17. We find that counsel for appellants provided such advocacy.

{¶44} Other districts have interpreted "incompetent" to mean a person who cannot understand the nature of, and participate in, the proceedings. *In re D.C.H.*, 9th Dist. Summit No. 22648, 2005-Ohio-4257, ¶ 8; *In re C.C.*, 11th Dist. Trumbull Nos. 2016-T-0050 and 2016-T-0058, 2016-Ohio-7447, ¶ 122; *In re H. Children*, 1st Dist. Hamilton No. C-190630, 2020-Ohio-774, ¶ 32-33. Similarly, R.C. 2111.01(D) provides that "incompetence" requires a determination that the person is incapable of taking care of himself or herself, or his or her property.

{¶45} After review of the record, we hold that the juvenile court did not abuse its discretion by denying appellants' motion to appoint a guardian ad litem on their behalf. The juvenile court reasonably determined that there was no showing of an appearance of mental incompetence. The fact that a person may be mildly intellectually disabled does not, in and of itself, conclusively determine whether a person is mentally incompetent. *See In re Amber G.*, 2004-Ohio-5665 at ¶ 19, citing *In re King-Bolen*, 2001 Ohio App. LEXIS 4551 at *30.

There is no indication that either appellant failed to understand the nature of the proceedings or inadequately participated in the matter. There was also no evidence that appellants were incapable of taking care of themselves. On the contrary, the record shows that appellants were not only receptive to the case plan requirements, but they were also cooperative and compliant with the case planning. Several of the FCCS caseworkers testified that appellants successfully completed their case plan requirements and were actively visiting their children. Additionally, the witnesses who had worked with appellants through in-home services testified that appellants were capable of taking care of themselves, such as cooking, cleaning, and paying bills. It was not unreasonable, arbitrary, or unconscionable for the juvenile court to deny the motion for an appointment of a guardian ad litem because appellants did not appear to be mentally incompetent. We further find that it was not unreasonable for the juvenile court to determine that the motion was untimely because appellants raised the issue only a few days before the second day of the permanent custody hearing.

{¶46} Accordingly, both of appellants' first assignments of error are overruled.

**C) The Juvenile Court's Decision to Grant Permanent Custody to FCCS.**

{¶47} Mother Assignment of Error No. 3:

{¶48} THE AWARD OF PERMANENT CUSTODY TO FAYETTE COUNTY CHILDREN'S SERVICES WAS ERROR BECAUSE THE AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILDREN.

{¶49} Mother's Assignment of Error No. 4:

{¶50} THE GRANT OF PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶51}   Mother's Assignment of Error No. 5:

{¶52}   THE TRIAL COURT'S FINDING THAT FCCS USED REASONABLE EFFORTS TO REUNITE THE FAMILY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶53}   Father's Assignment of Error No. 2:

{¶54}   THE TRIAL COURT'S AWARD OF PERMANENT CUSTODY TO THE AGENCY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THUS CONSTITUTES REVERSABLE [sic] ERROR.

{¶55}   Father Assignment of Error No. 3:

{¶56}   THE AGENCY DID NOT USE REASONABLE EFFORTS TO PREVENT REMOVAL OR TO REUNITE THE CHILDREN TO FATHER-APPELLANT.

{¶57}   In their remaining assignments of error, appellants argue that the juvenile court erred when it granted permanent custody of the children to FCCS.  In support of their argument, appellants assert that there was insufficient evidence to grant permanent custody and even if there were some, competent credible evidence, the decision was against the manifest weight of the evidence because FCCS did not seek out enough services for appellants.  Appellants further contend that FCCS failed to make reasonable efforts to prevent the continued removal of the children from appellants' home pursuant to R.C. 2151.419.

**1) Permanent Custody**

{¶58}   A parent has a constitutionally protected liberty interest to the care and custody of his or her children.  *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238, ¶ 10; *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 39.  In order to terminate those parental rights, the state is required to prove by clear and convincing evidence that the

statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11; *In re G.C.,* 12th Dist. Butler Nos. CA2016-12-237 thru CA2016-12-240, 2017-Ohio-4226, ¶ 32. At issue in this case are the statutory standards for permanent custody found in R.C. 2151.414(B).

{¶59} Subject to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court finds that (1) permanent custody is in the best interest of the child and (2) one of the following R.C. 2151.414(B)(1)(a)-(e) factors exists: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or on three separate occasions the child or another child in the custody of the parent from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child. *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 13. To determine the best interest of the child, the juvenile court shall consider the factors in R.C. 2151.414(D)(1). *In re C.D.*, 12th Dist. Clermont No. CA2019-02-014, 2019-Ohio-4911, ¶ 14. These R.C. 2151.414(D)(1) factors are

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public

children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**2) Appellate Standard of Review**

{¶60} Generally, an appellate court is limited to considering whether sufficient credible evidence exists to support the juvenile court's permanent custody decision. *In re D.P.*, 12th Dist. Butler No. CA2020-07-074, 2020-Ohio-6663, ¶ 13. Under this standard of review, an appellate court will reverse a juvenile court's decision only if there is a sufficient conflict in the evidence presented. *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17.

{¶61} Even if there is sufficient evidence, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence. *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15. In evaluating whether the judgment is against the manifest weight of the evidence, an appellate court considers the credibility of the witnesses and weighs the evidence to determine whether the finder of fact clearly lost its way resolving any conflicts in the evidence and created a manifest miscarriage of justice. *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. If an appellate court concludes that the judgment is against the manifest weight of the evidence, the judgment must be reversed, and a new trial ordered. *In re D.P.*, 2020-Ohio-6663, ¶ 14. When weighing the evidence, an appellate court must be mindful of

the presumption in favor of the findings made by the finder of fact and that any evidence susceptible to more than one construction will be construed to sustain the judgment. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 through CA2014-11-238, 2015-Ohio-1343, ¶ 25.

**3) Juvenile Court's Decision**

{¶62} In its decision granting permanent custody to FCCS, the juvenile court found that FCCS had been involved with appellants on several occasions since 2013. More recently, FCCS initiated alternative responses in February 2016 and March 2017 because of unsanitary conditions the agency found in appellants' home. As part of the instant case, the juvenile court found that the case plan required appellants to obtain suitable housing, participate in parenting education classes, undergo a mental health assessment, and have no contact with Father's brother. Throughout the pendency of the case, the juvenile court noted that appellants attended the scheduled visits with the children. However, the juvenile court found that appellants' extended home visit with the two older children was unsuccessful and the children were again removed from the home and placed in foster care. The juvenile court further found that appellants completed several parenting education classes, participated in personal counseling, and received in-home services to aid in their development.

{¶63} In awarding permanent custody to FCCS, the juvenile court appropriately applied the R.C. 2151.414(B) test to find that permanent custody was in the best interest of the children. The juvenile court found that all the children had shown beneficial development from their placement with foster families. The juvenile court also determined that all of the children had been in the custody of FCCS for 12 out of 22 consecutive months. In addition to those findings, the juvenile court found that

[t]he children cannot be placed with any of their parents within a reasonable time, and should not be placed with any of their parents. [Mother] and [Father] do not possess the cognitive abilities to care for the children.

Finally, the juvenile court found that FCCS had made reasonable efforts to reunify the family.

**4) Analysis**

{¶64} After thoroughly reviewing the record, we hold that the decision to award permanent custody to FCCS was supported by clear and convincing evidence and not against the manifest weight of the evidence.

{¶65} Appellants do not dispute the juvenile court's R.C. 2151.414(B)(1)(d) finding that the children had been in the temporary care of FCCS for 12 out of 22 consecutive months.[8]  Furthermore, R.C. 2151.414(E) provides guidelines for the juvenile court to determine whether the children can be placed with the parents within a reasonable time. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 17.  Pursuant to R.C. 2151.414(E)(2), the juvenile court may determine that an intellectual disability is so severe that it makes a parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the permanent custody hearing.  By finding that appellants "do not possess the cognitive abilities to care for the children," the juvenile

---

8. We note that the two younger children, R.K. and B.K., have not been in the temporary custody of FCCS for a complete 12 months.  Instead, at the time FCCS filed for permanent custody they were five days short of the 12-month period.  To calculate the starting date for temporary custody the court shall use the earlier of 60 days after removal or the date the child is adjudicated pursuant to R.C. 2151.28.  *See* R.C. 2151.414(B)(1)(e).  The earlier time here is sixty days after the removal of the children, which would be August 25, 2018.  Thus, in order for the 12 of 22 factor to apply, the motion for permanent custody relating to R.K. and B.K. should not have been filed prior to August 25, 2019. The motions for permanent custody relating to R.K. and B.K. were filed on August 20, 2019. An agency may not file for permanent custody before the 12-month period has elapsed.  *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 26.  As discussed, appellants did not contest the juvenile court's timing determination and we do not find this five-day discrepancy rises to the level of plain error.  Moreover, by making the R.C. 2151.414(E)(2) finding, the juvenile court essentially found the alternative R.C 2151.414(B)(1)(a) factor applied which dispenses with the need for any other R.C. 2151.414(B)(1) factor.  *In re C.S.*, 2020-Ohio-4414 at ¶ 19.

court determined that the children cannot be placed with either Mother or Father pursuant to R.C. 2151.414(E)(2).

{¶66} The record clearly and convincingly supports the juvenile court's determination. Despite interventions in 2013, 2016, and 2017 to remedy the conditions necessitating placement of the children outside of their home, appellants' home repeatedly relapsed into the condition prompting the intervention. After six months in foster care, F.S. and S.K. were permitted to return home for an extended visit, however, the extended visit had to be terminated due to the children's regressive behaviors.

{¶67} Numerous witnesses testified that they believed appellants would be unable to successfully parent without some kind of in-home mentoring system in place to provide continuous support because of appellants' intellectual disabilities. This belief was shared by appellants' case managers from the Scioto Paint Valley Mental Health Center that provided them with ongoing in-home support services. Even though the case managers thought that eventually monitoring could be tapered off, they were unable to predict how long the support would be necessary. Appellants' mental health professionals acknowledged that it would take more time for appellants to develop the skills to be able to independently parent the children. The psychologist also opined that she believed appellants would never be able to master parenting skills.

{¶68} Although there was evidence that appellants had completed their case plan requirements, "the key concern is not whether the parent has successfully completed the case plan, but whether the parent has *substantially remedied* the concerns that caused the child's removal from the parent's custody." (Emphasis sic.) *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification, as the case plan is

simply a means to a goal, but not the goal itself." *In re A.R.,* 12th Dist. Butler No. CA2015-08-143, 2016-Ohio-4919, ¶ 18. Also, case plan compliance does not prove that appellants may function within their intellectual disabilities in such a manner that they could provide an adequate permanent home for the children within one year from the date of the permanent custody hearing. *See In re M.H.,* 4th Dist. Pike No. 17CA882, 2017-Ohio-7365, ¶ 102.

{¶69} As to the children's best interests, the evidence supports the juvenile court's finding that the children were progressing well in their foster placements and that permanent custody was in their best interests. The best interests of the children are served by being placed in a permanent situation that fosters growth, stability, and security. *In re D.P.,* 2020-Ohio-6663 at ¶ 26. No one disputed that appellants loved their children, instead the concern was appellants' ability to maintain a safe home and successfully provide for the children's needs. *See e.g. In re N.L.,* 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 31 (permanent custody to a children services agency was appropriate where an intellectually disabled parent could not provide for the safe and appropriate care of her child without consistently relying on the assistance and judgment of others). The juvenile court's decision was based on appellants' capability to parent their four children adequately and safely. We find that there was sufficient evidence to support the juvenile court's decision to grant permanent custody and the decision was not against the manifest weight of the evidence. Accordingly, Mother's third and fourth and Father's second assignments of error are overruled.

{¶70} Next, we find that appellants' argument that FCCS failed to use reasonable efforts lacks merit. The Ohio Supreme Court has held that the reasonable efforts finding mandated by R.C. 2151.419 is not required in a permanent custody proceeding unless the juvenile court has previously failed to make such a finding. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 4. The record reflects that the juvenile court made reasonable-effort

- 23 -

findings at various points throughout the case for all the children as demonstrated in the adjudicatory, dispositional, and review journal entries.  Consequently, the agency did not need to prove at the permanent custody hearing that it made reasonable reunification efforts.  *Id.* at ¶ 45; *See also In re K.C.*, 4th Dist. Athens No. 20CA8, 2021-Ohio-184, ¶ 34-35.  Notwithstanding our determination that the finding was unnecessary, in its decision the juvenile court found that FCCS made reasonable efforts to reunify the family.  This court has explained that reasonable efforts does not mean all available efforts.  *In re K.B.*, 12th Dist. Clermont Nos. CA2015-01-011 and CA2015-01-012, 2015-Ohio-2732, ¶ 50.  Mother's fifth and Father's third assignments of error are overruled.

{¶71}  Judgment affirmed.

PIPER, P.J., and M. POWELL, J., concur.