[Cite as *In re J.G.*, 2021-Ohio-3259.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | |
| J.G. 2 (DOB: 10/23/2011) | : | Hon. Craig R. Baldwin, P.J. |
| | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| | : | |
| | : | Case No. CT2021-0019 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Muskingum County
Court of Common Pleas, Juvenile
Division, Case No. 21730262

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      September 15, 2021

APPEARANCES:

For Muskingum Co. Adult and:      For Mother P.G.:
Child Protective Services:      ANDREW RUSS
RON WELCH      P.O. Box 520
MUSKINGUM CO. PROSECUTOR      Pickerington, OH 43147
JOHN CONNOR DEVER
27 North Fifth St., P.O. Box 189      For Foster Parents:
Zanesville, OH 43702      SCOTT RANKIN
      45 N. 4th Street
Guardian Ad Litem:      Zanesville, OH 43701
RUTHELLEN WEAVER
542 S. Drexel Avenue
Bexley, OH 43209

*Delaney, J.*

{¶1} Appellant P.G. ("Mother") appeals from the March 18, 2021 Entry Terminating Parental Rights and Granting Permanent Custody of the Minor Child to Muskingum County Children Services of the Muskingum County Court of Common Pleas, Juvenile Division. Appellee is Muskingum County Adult and Child Protective Services ("Agency").

## FACTS AND PROCEDURAL HISTORY

{¶2} This case is related to, but not consolidated with, *In the Matter of: J.G. 1*, 5th Dist. Muskingum No. CT2021-0017. J.G. 2 is the sibling of J.G. 1 and both are the natural children of appellant Mother.

### *Procedural history*

{¶3} On March 4, 2015, the Agency filed a complaint for both children and they were adjudicated dependent and neglected.

{¶4} At a review hearing on May 23, 2017, Mother agreed for the children to be placed in the legal custody of a relative, T.M. T.M. voluntarily returned the children to the Agency on October 2, 2017 and the children were returned to foster care.

{¶5} On December 4, 2017, the original cases were dismissed due to time limitations. The Agency refiled a Complaint for both children alleging dependency and requesting permanent custody.

{¶6} On February 22, 2018, the children were adjudicated dependent. On July 31, 2018, a hearing was held upon the Agency's ongoing request for permanent custody. An interim order was issued placing the children in the Agency's temporary custody and ordering an attempted reunification with maternal relative T.M.

{¶7} On March 8, 2019, a hearing was held upon the Agency's motion for permanent custody, Mother's oral motion to reinstate visitation, and Mother's oral motion to dismiss the Agency's complaint. The trial court issued an interim order continuing the motion for permanent custody and denying Mother's motions. The children continued in the Agency's temporary custody and the Agency was ordered to immediately file all omitted case plans. Additionally, the trial court ordered T.M. to be added to the case plan.

{¶8} The Agency filed an amended case plan on March 15, 2019.

{¶9} On June 21, 2019, the trial court denied the Agency's request for permanent custody and found that from July 31, 2018 through March 8, 2019, the Agency failed to make reasonable efforts and failed to work any meaningful permanency plan and reunification with the prior legal custodian, T.M., and/or either legal parent. The children continued in the temporary custody of the Agency and a review was scheduled for June 25, 2019.

{¶10} A review hearing was held on June 25, 2019, and the children were continued in the temporary custody of the Agency. Visitation with Mother and/or other family members were ordered at the discretion of the Agency.

{¶11} On October 22, 2019, the Guardian Ad Litem filed a motion for permanent custody.

{¶12} On April 7, 2020, the Agency also filed a motion for permanent custody.

{¶13} A hearing began on October 27th, 2020, and the trial court granted the Agency's motion by judgment entry dated March 18, 2021. The following evidence is adduced from the permanent custody hearing.

*Evidence adduced at the permanent custody hearing*

{¶14} Mother is the natural mother of J.G. 1 (DOB: 11/26/2010) and J.G. 2 (DOB: 10/23/2011) ("the children"). K.G. is the natural father of the children.[1]

{¶15} The case was originally opened in February 2015 due to domestic violence between Mother and her live-in paramour at the time, Kevin Gilmore. In January 2015, Mother was charged and convicted of domestic violence after she stabbed Gilmore during an argument. The children were present in the home during the stabbing, although accounts differed as to whether they were upstairs at the time or sitting in the same room and actually witnessed the incident.

{¶16} Mother completed a domestic violence assessment in early April 2015, but was charged with a new domestic violence offense on April 22, 2015, also against Gilmore.

{¶17} The Agency was also concerned about confirmed drug use in the home.

{¶18} Mother's progress on her case plan was hindered by her problematic behaviors. Agency caseworkers described Mother's "outbursts, instability, and lack of impulse control." At the first six-month review, Mother was asked to leave due to her out-of-control behavior. Mother threatened the life of an ongoing caseworker, resulting in a conviction of aggravated menacing. During the progress of the case, several different caseworkers were assigned due to Mother's behaviors, threats, and failure to cooperate with each successive caseworker.

---

[1] Father has been incarcerated for the majority of the case; he is unwilling or unable to complete case plan services and has had no meaningful contact with the children or the Agency. He is not a party to this appeal. As of August 2016, Father was sentenced to a six-year prison term.

{¶19} Mother eventually completed an anger management program, but an Agency supervisor testified that she continues to demonstrate outbursts, instability, and a lack of impulse control.

{¶20} On July 17, 2018, law enforcement went to Mother's house to serve a warrant on her then-paramour, Joshua Stevenson, who was hiding in the house. Mother denied Stevenson was in the house, became agitated, and was ultimately arrested and charged with obstructing official business. Upon transport to the county jail, Mother demanded that deputies remove their badges so she could fight them and "not get into trouble."

{¶21} On October 17, 2019, Mother was charged with disorderly conduct after she waited for Stevenson in an alley near the courthouse and spat on him.

{¶22} Mother's criminal history is thus replete with domestic violence and other offenses stemming from her anger and lack of impulse control. The trial court cited Mother's record of criminal charges and convictions as follows: domestic violence in 2013; domestic violence as reduced from assault in July 2014; domestic violence in March 2015; domestic violence in June 2015; aggravated menacing in April 2016; possession of drug paraphernalia in April 2018; and obstructing official business in September 2018.

{¶23} Mother also has a history of relationships with men with extensive criminal histories. Her paramour at the time of the permanent custody hearing, Derek Combs, was recently released after a four-year prison term for convictions of burglary and theft in 2016. Mother was involved in domestic violence incidents with K.G., the children's father, in August and November, 2012. Father was arrested and convicted of domestic violence following those incidents. Mother's subsequent paramour Kevin Gilmore was involved in

domestic violence incidents with Mother in April and July 2014 and April 2015. Gilmore was convicted of domestic violence following each of those incidents. Dr. Gary Wolfgang, a psychologist, in fact testified that Mother has never had a romantic relationship that was not problematic.

{¶24} Mother's drug use was a concern. Mother has continued marijuana use throughout the history of the case and obtained a medical marijuana card prior to the permanent custody hearing. The physician who prescribed the medical marijuana card testified that the prescription was based upon Mother's self-reported diagnosis of PTSD when she was a juvenile. The prescribing physician also acknowledged that medical marijuana is meant to be vaporized, thus failing to explain Mother's posts on social media about smoking her "medical marijuana" as a "blunt." A friend of Mother's testified that Mother "likes to have a good time" and that Mother smokes "blunts" and pipes containing marijuana. Mother submitted 54 drug screens for testing over the history of the case, and 53 were positive for marijuana.

{¶25} Mother's only income is $783 per month from Social Security Disability and Mother claims to spend $100-300 per month on marijuana.

{¶26} In 2018, Mother entered a substance abuse treatment program at St. Lucy Sober House for Women and was recommended for a 90-day treatment program, but left against staff advice less than a week later. The Agency subsequently referred Mother to another inpatient substance abuse program at Women's Recovery, but Mother denied the need for treatment and demanded to be treated at a facility that "only" dealt with marijuana abuse.

{¶27} Dr. Wolfgang completed two psychological evaluations of Mother and testified about her extensive history of mental illness. Mother's romantic relationships are fraught with problems; she minimizes the effect of domestic violence on her children; and minimizes her own history of treatment as a child. Mother reported diagnoses of bi-polar, obsessive-compulsive disorder, and social anxiety, but resisted psychotropic medication while extolling the virtues of cannabis, which she started using at age 12.

{¶28} Dr. Wolfgang observed Mother to be very angry and opinionated, to have very little impulse control, and to have engaged in a pattern of interactions with individuals that escalate into violence. Ultimately, Wolfgang testified, a successful outcome is unlikely if Mother is reunited with the children because Mother is a "very, very disturbed young girl."

{¶29} Further, Mother has very limited awareness of her own mental health issues despite a history of mental health treatment. As a child, Mother received mental health treatment including inpatient care between the ages of 12 and 18. She has not, however, engaged in mental health services for some time. A social worker/clinician at All Well Behavioral Health testified that she conducted a mental health assessment of Mother on January 29, 2020; she diagnosed Mother with adjustment disorder, mild cannabis use, and PTSD, but Mother stopped attending counseling in June 2020.

{¶30} Shortly after the case was opened, Mother was evicted from her housing; in 2018, she was reported to be homeless and staying with various friends. At the time of the permanent custody hearing, Mother did have housing, renting a one-bedroom home which she testified could be turned into a three-bedroom home. Mother did not provide confirmation of this statement from the homeowner.

{¶31} Mother does not have a vehicle or a valid driver's license.

{¶32} Mother's visitation with the children has been supervised at the Agency for most of the case due to Mother's outbursts and unpredictability. Sometimes, a social worker testified, Mother has "blown up at stuff" and lost her temper, and Agency staff had to intervene to remove the children from the room. Once Mother was visiting with J.G. 2 and became frustrated; in an attempt to correct the child, Mother "smacked [the child's] hand five or six times." Agency staff had to intervene and advise Mother that the Agency does not condone physical punishment. Mother's visits have been suspended at times. At one point, visitation was supervised by the foster placement, but due to Mother's outbursts, had to be moved back to the Agency.

{¶33} Mother has not completed case plan services despite the case being open over five years.

{¶34} A relative of Mother, T.M., came forward in May 2017; following a home study and agreement by Mother, the children were placed in T.M.'s legal custody on May 23, 2017. In October 2017 T.M. voluntarily returned the children to the Agency, citing the children's special needs and Mother's behavior as reasons why she could not continue to care for them. The children were returned to foster care.

{¶35} In July 2018 T.M. again agreed to care for the children and was granted party status; an attorney was appointed to represent T.M.'s interest in the matter and the trial court ordered that the Agency attempt reunification between the children and T.M. The children were placed in T.M.'s home on August 15, 2018; on August 27, 2018, T.M. again voluntarily surrendered the children due to their behaviors and the behavior of

Mother. J.G. 1 was immediately removed and placed in residential treatment; J.G. 2 was removed on September 8, 2018 and placed in foster care.

{¶36} The trial court found that the Agency made reasonable efforts to find a less-restrictive or kinship placement for the children, but no appropriate placement has been found.

{¶37} The children are now ten and eleven years old, and were five and six when the case was opened. They are both special needs children and have extreme behavioral issues.

{¶38} J.G. 1 has delayed cognitive functioning and has a difficult time processing normal-age information in the areas of speech and bathroom habits. J.G. 1 was in residential treatment at Belmont Pines where issues addressed included mood stability, decreasing aggressive behaviors, improving social interactions with peers and adults, improving the relationship with Mother, attending school, and improving personal hygiene and impulse control. Stressors upon J.G.1 include the history of physical and emotional abuse and exposure to domestic violence and drug use.

{¶39} J.G. 1 has moved at least 11 times, including several different family-certified foster homes, several therapeutic foster homes, and two different residential treatment facilities.

{¶40} J.G. 1 is presently in a Level 5 treatment foster-to-adopt home and is doing well. The current foster placement for J.G.1 testified that J.G.1's severe behaviors upon placement included aggression, tantrums, cursing, threats, sleeping issues, fear of using the bathroom, and angry outbursts. However, upon a change of medication and learning

how to address J.G. 1's behaviors, those behaviors have improved. J.G. 1 continues in weekly counseling.

{¶41} A counselor for J.G. 2 testified that the child has been in counseling since May 2019 and has been diagnosed with ADHD and Adjustment Disorder with a Disturbance in Emotion and Conduct. The counselor worked with J.G.2 on impulse control, emotional regulation, the child's relationships with peers and the foster family. The counselor testified that J.G. 2 has concerns regarding visitation with Mother and J.G. 1; the counselor gave J.G. 2 a "safe word" to use during visitations with Mother if the child became uncomfortable and wanted intervention by a social worker to end the visit.

{¶42} Mother has admitted J.G. 2 was exposed to domestic violence and criminal activity in the home.

{¶43} A school psychologist testified who has been involved with J.G. 2 for three years. Over that time, J.G. 2 showed great improvement in all areas of the BASC test (Behavior Assessment System for Children).

{¶44} J.G. 2 has been moved at least nine times, including several different family foster homes. J.G. 2 is presently in a foster-to-adopt home and is doing very well.

{¶45} J.G. 2's foster mother also testified that J.G. 2's severe behaviors have greatly improved during the child's time in foster placement, but those behaviors did regress when visits with Mother started again.

{¶46} The trial court conducted in-camera interviews of both J.G. 1 and J.G. 2. J.G. 1 appeared younger than his or her age and had evident cognitive delays, including an inability to sit still. Although the child was very talkative, he or she was easily distracted and avoided all eye contact. J.G. 2 was very well-behaved and forthcoming. Both

children are described as in "good places," happy, comfortable, and bonded in their current foster placements. The children's needs are being met by the foster placements.

{¶47} The trial court granted the Agency's motion for permanent custody by Judgment Entry dated March 18, 2021. Mother now appeals from the judgment entry of the trial court.

{¶48} Mother raises one assignment of error:

## ASSIGNMENT OF ERROR

{¶49} "THE JUVENILE COURT'S JUDGMENT GRANTING PERMANENT COURT COMMITMENT OF THE MINOR CHILD TO MUSKINGUM COUNTY CHILDREN'S SERVICES WITHOUT APPOINTING APPELLANT A GUARDIAN AD LITEM WAS CONTRARY TO R.C. 2151.281 AND OHIO JUVENILE RULE 4."

## ANALYSIS

{¶50} In her sole assignment of error, Mother argues the trial court erred in granting the Agency's motion for permanent custody of the children without appointing a guardian ad litem on Mother's behalf. We disagree.

{¶51} At the permanent custody hearing, two mental health professionals testified about Mother's mental health issues: Dr. Wolfgang, a psychologist, and Kathy Chapman, a social worker/clinician. Both witnesses addressed Mother's litany of mental health diagnoses, including but not limited to bipolar disorder, social anxiety, obsessive-compulsive disorder, and depression. The witnesses also discussed Mother's cannabis use and her anger and volatility. The record is devoid of evidence that any of these issues rendered Mother "incompetent," however, and any question of Mother's competence was not raised during the history of the case, nor at the evidentiary hearing.

{¶52} Mother directs our attention to R.C. 2151.281(C), which states: "In any proceeding concerning an alleged or adjudicated delinquent, unruly, abused, neglected, or dependent child **in which the parent appears to be mentally incompetent** * * *, the court shall appoint a guardian ad litem to protect the interest of that parent." (Emphasis added).

{¶53} Additionally, Ohio Juv.R. 4(B) states in pertinent part: The court shall appoint a guardian ad litem to protect the interests of a child or incompetent adult in a juvenile court proceeding when:

> * * * *.

> (3) The parent is under eighteen years of age **or appears to be mentally incompetent**;

> * * * *.

> (8) Appointment is otherwise necessary to meet the requirements of a fair hearing;

> * * * *. (Emphasis added).

{¶54} Courts have used the definition of "incompetence" from the criminal code in applying the Rule and the statute; in the context of a criminal trial, a defendant is deemed to be incompetent to stand trial, if, because of her present mental condition, she "is incapable of understanding the nature and objective of the proceedings against [her] or of assisting in [her] defense [.]" *In re D.C.H.*, 9th Dist. Summit No. 22648, 2005-Ohio-4257, ¶ 8, citing R.C. 2945.37(G).

{¶55} Mother summarily argues that she is "clearly an incompetent adult" without pointing to any evidence in the record that she was incapable of understanding the nature

and objective of the permanent-custody proceedings. Brief, 6. Mother points to Dr. Wolfgang's testimony that she had a (self-reported) history of mental illness and treatment as a child, and he diagnosed her with contemporaneous permanent, chronic mood issues and personality disorders, and multiple dysfunctional personality traits. Mother offers no authority for her underlying premise that Wolfgang's mental health assessment rendered her "incompetent" within the meaning of R.C. 2151.281(C) and Juv.R. 4.

{¶56} Additionally, neither Mother nor her attorney requested appointment of a guardian ad litem on Mother's behalf, therefore Mother has waived all but plain error. *In re McHugh Children*, 5th Dist. Licking No. 2004CA00091, 2005-Ohio-2345, ¶ 37. The plain-error doctrine originated in criminal law and is embodied in Crim.R. 52(B) which provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *Id.*, citing *In re Etter*, 134 Ohio App.3d 484, 492, 731 N.E.2d 694 (1st Dist.1998). The plain-error doctrine has been applied in civil cases as well. *Id.*, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997); see also, *In re Etter,* supra. Plain error may be applied only in the extremely rare civil case " * * * where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, public confidence in, judicial proceedings." *Id.*

{¶57} In an appropriate case, a reviewing court can find plain error when the trial court has failed to appoint a guardian ad litem and such failure results in prejudice to the party in need of a guardian. *McHugh*, supra, at ¶ 38, citing *In re Holmes*, 8th Dist. Cuyahoga No. 77785, 2001 WL 128007, *3.

{¶58} The first inquiry in determining whether the trial court complied with R.C. 2151.281(C) and Juv.R. 4(B) is whether the parent appeared "mentally incompetent" during the trial court proceedings. *McHugh*, supra, at ¶ 48, internal citations omitted. As the Agency points out, Mother did not appear mentally incompetent during the proceedings. She took the stand upon being called by her own counsel for direct examination; she testified to her children's names and birthdates, her residential address, her relationship with her father; her childhood experience with children's services; her mental health history; and her high school grade point average. She demonstrated that she understood the case plan and its objectives, and that she understood the stakes of permanent custody and her children's best interest. Although Mother was sometimes reprimanded by the trial court for argumentative responses, her mental competency was not at issue in the proceedings.

{¶59} Mother points to no evidence in the record indicating that she was not mentally competent. Instead, she argues that she has extensive mental health diagnoses such as post-traumatic stress disorder and bipolar disorder. The existence of these mental disorders does not equate to incompetence and Mother points to no authority demonstrating otherwise.

{¶60} If the court finds that a guardian ad litem should have been appointed, the next inquiry is whether there was any prejudice by the failure to appoint a guardian ad litem. *McHugh*, supra, at ¶ 49, internal citations omitted. Mother does not point to any prejudice she sustained from the absence of her own guardian ad litem. The procedural history of this case indicates Mother had many opportunities to cooperate with the Agency and to work her case plan, but her own volatility stood in her way. We cannot discern,

and Mother does not explain, how the presence of a guardian ad litem would have changed the effect of Mother's volatile disruptive behavior. Further, "a parent will not suffer prejudice if the parent is represented by counsel and that counsel 'safeguards the parent's rights and advocates for reunification in accordance with the parent's wishes.'" *In re F.S.*, 12th Dist. Fayette No. CA2020-08-011, 2021-Ohio-345, ¶ 43, citing *In re M.T.*, 6th Dist. Lucas No. L-09-1197, 2009-Ohio-6674, ¶ 17. In the instant case, the record supports our conclusion that Mother's counsel safeguarded her rights and advocated for reunification in accord with her wishes.

{¶61} Mother has not pointed to anything in the record to show how she was prejudiced by the failure to have a guardian ad litem and also has not argued how having a guardian ad litem would have altered the outcome. *McHugh*, supra, at ¶ 50.

{¶62} We conclude appointment of a guardian ad litem would not have remedied Mother's failure to comply with her case plan and would not have changed her history of volatile, disruptive behavior. In short, the evidence was overwhelming in support of the Agency obtaining permanent custody. We further find that Mother had been adequately protected because she had been represented by counsel throughout the entire dispositional hearing. *McHugh*, supra, at ¶ 52.

{¶63} Mother has not shown that she was prejudiced by the lack of an appointed guardian ad litem and her sole assignment of error is therefore overruled.

## CONCLUSION

{¶64} Mother's sole assignment of error is overruled and the judgment of the Muskingum County Court of Common Pleas, Juvenile Division is affirmed.

By: Delaney, J.,

Baldwin, P.J. and

Wise, John, J., concur.